ROGERS, J.
 

 Plaintiffs, as the owners of an undivided ten-twelfths interest in the property, brought this suit for the cancellation of an oil and gas lease covering lot 8, containing approximately 72 acres, of a certain subdivision in the Hack-berry oil field. Plaintiffs grounded their action on the alleged failure of the defendants to comply with their contract to develop the land with reasonable diligence after the discovery of oil in paying quantities. Defendants filed an exception of nonjoinder, which
 
 *556
 
 was overruled. At the inception of the trial of the case, defendants by way of objection to evidence interposed an exception of no cause of action, which exception was also overruled. On the merits, plaintiffs’ demand was rejected. Plaintiffs appealed, and defendants answered the appeal, praying that the exception of nonjoinder be maintained. Defendants also filed in this court an exception'of no cause or right of action.
 

 We do not find it necessary to consider defendants’ exceptions. On the merits, we think the judgment is correct.
 

 The lease, which was executed on January 8, 1927, embraces land in what is generally regarded as “wild cat” territory. The consideration for the contract was $2,400 cash and the usual royalties. The lease gave the defendants a limit of one year from its date within which to begin drilling operations. The contract also provided that, after the discovery of any mineral in paying quantities, the lessees could maintain their rights in effect as long as they pleased by “proceeding with reasonable diligence to develop the land.” The agreement further stipulated that, if prior to the discovery of oil, a well producing as much as 100 barrels of oil per day for 30 .consecutive days is brought in on adjacent land, and within 200 feet of the land embraced within the lease, the lessees should with reasonable promptness begin, and with reasonable diligence prosecute, the drilling of a well on the leased premises in an honest effort to discover oil in paying quantities.
 

 The defendants began their drilling operations on January 28, 1928, and between that time and April 8, 1929, the date this suit was filed, they drilled five wells on the leased property. These wells were as follows, viz.: Well No. 1, begun January 28, 1928, completed April 20, 1928, resulting in a dry hole; well No. 2, begun February 6,1928, completed June 2S, 1928, and abandoned; well No. 3, begun July 20, 192S, completed August 15, 1928, and produced a small quantity of oil; well No. 4, begun September 16, 1928, completed October 10, 1928, resulting in a 790-barrel well; well No. 5, begun January 27, 1929, completed April 2, 1929, six days before suit was filed, and later abandoned. Other wells were begun and completed subsequent to the drilling and completion of well No. 5.
 

 Defendants drilled and completed five wells within a period of thirteen months at a gross cost to them of $105,438.67. As a result of their operations, they obtained one small producing well, from which they received $22,-933.80; their net loss being $S2,504.87.
 

 Plaintiffs complain of defendants’ delay in beginning drilling operations on well No. 5 after the completion of well No. 4, contending that the lapse of time between the wells was a violation of the provision of the lease requiring development with reasonable diligence after the discovery of a mineral in paying quantities.
 

 Plaintiffs’ witnesses testified that the delay elapsing between the drilling of wells Nos. 4 and 5 was unreasonable. On the other hand, defendants’ witnesses testified that the delay was not unreasonable. Thé judge of the district court resolved the conflict in the testimony in favor of the defendants. We cannot say that he erred in so doing. It is undisputed that there is no recognized limit of time in oil fields within which another well should be drilled after a producing well is brought in. Each oil field has its own peculiar and distinctive features. What would be reasonable development in one field would not be reasonable development in another field. The leased property is situated in what is known as a salt dome field of the nature of those usually found in the Gulf Coast region. It is characteristic of this kind of territory that
 
 *558
 
 the oil is generally found around the periphery of the dome in elevated sands adjacent to the salt core where a reservoir is created. At the time of the filing of this suit, the proven territory around the East Haekberry dome was of limited extent. The known producing area of the leased property consisted of a narrow strip along its northern edge. Irregular projections, known as “Fingers,” of the salt dome made difficult of determination the exact location of the narrow area in which oil might he expected to he discovered. These circumstances account for the fact that defendants obtained only one producing well out of the first four wells drilled, by them. In this situation, defendants utilized the delay complained of by plaintiffs in having geophysical examinations made in order to ascertain, as far as it was scientifically possible to do so, the best place at which to drill their next well with a view of maximizing their chance of obtaining a producer. This investigation was only completed in January, 1929, at which time defendants began their drilling operations on well No. 5.
 

 Plaintiffs argue that defendants’ development of the leased property should be tested by their development of the adjoining Watkins property, which they also held under lease. In thirteen months, defendants drilled twelve wells on the Watkins tract. But eight of these twelve wells were producers, showing conclusively that the Watkins property, a large area of which was productive, was a better property for oil-drilling purposes than plaintiffs’ property, the productive area of which had proven to be of limited extent. And, moreover, that which is done to develop one oil lease cannot establish the standard of reasonable development for another oil lease.
 

 Plaintiffs allege that defendants breached the lease contract by failing to drill the necessary offset wells to protect the boundaries of the leased property. But the lease contract itself does not provide for the drilling of offset wells after the discovery of oil on the lands embraced therein. Offset wells are necessary to prevent the drainage of oil from lands only when such drainage is physically possible. Unless there is such a possibility, it would serve no useful purpose to drill an offset well, and a lessee ought not be required to do so, unless Ms contract expressly imposes the burden upon him. In the case at bar, the judge of the district court found there was no evidence to show that any well on adjoining lands drained any oil from the leased premises, and our examination of the record has convinced us that his finding is correct.
 

 Mineral leases of the character of the one under review here necessarily contemplate the development of the lands embraced therein for the mutual benefit of the contracting parties. Hiller- v. Humphreys Carbon Co., 165 La. 370, 115 So. 623. Defendants have invested heavily in their attempt to develop the leased property. They are not charged, nor are they chargeable, with fraud or bad faith. And we do not think they should be divested of their acquired rights under the lease merely because of a difference of opinion between them and the plaintiffs as to whether or not they are developing the leased property with reasonable diligence.
 

 For the reasons assigned, the judgment appealed from is affirmed.